IN THE UNITED STATES DISTRICT COURT
FOR THE MIDDLE DISTRICT OF GEORGIA
ALBANY DIVISION

| | |
|---|---|
| JAY WOOD, | |
| Plaintiff, | Civil Action No. _____ |
| v. | |
| METROPOWER, INC. and PPC PARTNERS, INC., | JURY TRIAL DEMANDED |
| Defendants. | |

## COMPLAINT

Plaintiff Jay Wood files this Complaint against her former joint employers, Defendants MetroPower, Inc. ("MetroPower") and PPC Partners, Inc. ("PPC") (collectively "Defendants"). Plaintiff alleges that Defendants violated Title VII of the Civil Rights Act of 1964, 42 U.S.C. § 2000e *et seq.* ("Title VII") by retaliating against her for opposing sex discrimination. Plaintiff further alleges that Defendants violated the Americans with Disabilities Act, as amended, 42 U.S.C. §12101 *et seq.* ("ADA") by (1) discriminating against her because of her disabilities and/or because Defendants regarded her as disabled and (2) failing to reasonably accommodate her disabilities, which included allowing her to take and return from a medical leave of absence to receive care related to her disabilities. Additionally, Plaintiff alleges that Defendants violated the Family and Medical Leave Act, 29 U.S.C. §§ 2601 *et seq.* ("FMLA") by (1) interfering with Plaintiff's rights under the FMLA and (2) retaliating against Plaintiff for engaging in activity protected under the FMLA. Finally, Plaintiff alleges that Defendants violated the Age

Discrimination in Employment Act, 29 U.S.C § 621 *et seq*. ("ADEA") by discriminating against her based on her age.  Plaintiff shows the Court as follows:

## INTRODUCTION

1. Plaintiff is a former employee of Defendants.  Plaintiff worked solely for Defendant MetroPower, Inc. from approximately November 1995 until it became a member of Defendant PPC Partners, Inc. in approximately 2018, at which time Defendants both employed Plaintiff.  Defendants terminated Plaintiff's employment on May 26, 2020.  Defendants last employed Plaintiff in the position of Fleet Manager.

2. Plaintiff is a female.  After subjecting Plaintiff to sex discrimination for years, Defendants retaliated against Plaintiff after she opposed such discrimination by, *inter alia*, terminating her employment.  With respect to Plaintiff's Title VII claims, she seeks declaratory relief, lost wages and benefits, including lost equity, compensatory damages, punitive damages, prejudgment interest, and attorneys' fees and costs.

3. Defendants violated the ADA by: (1) discriminating against Plaintiff based on her disabilities and/or because Defendants regarded her as disabled; and (2) failing to accommodate Plaintiff's disabilities, including allowing her to return from approved medical leave.  With respect to her ADA claims, Plaintiff seeks declaratory relief, lost wages and benefits, including lost equity, compensatory damages, punitive damages, prejudgment interest, and attorneys' fees and costs.

4. Defendants violated the FMLA by interfering with Plaintiff's FMLA rights and retaliating against her for requesting and taking FMLA leave.  With respect to her FMLA claims,

Plaintiff seeks declaratory relief, lost wages and benefits, including lost equity, liquidated damages, prejudgment interest, and attorneys' fees and costs.

5. Finally, Defendants violated the ADEA by discriminating against Plaintiff on the basis of her age by terminating her employment. With respect to her ADEA claim, Plaintiff seeks declaratory relief, lost wages and benefits, including lost equity, liquidated damages, prejudgment interest, and attorneys' fees and costs of litigation.

## JURISDICTION AND VENUE

6. This Court has federal question jurisdiction over Plaintiff's Title VII, ADA, FMLA, and ADEA claims, pursuant to 28 U.S.C. § 1331.

7. Pursuant to 28 U.S.C. § 1391(b) and Local Rule 3.4, venue is proper in this Court because the unlawful employment practices described herein were committed within the Albany Division of the Middle District of Georgia.

## PARTIES

8. Plaintiff is a citizen of the United States of America and a resident of the State of Georgia; she submits herself to the jurisdiction of this Court.

9. At all relevant times, Plaintiff is and was a qualified individual with disabilities within the meaning of the ADA.

10. Defendant MetroPower, Inc. employed Plaintiff from approximately November 1995 to May 26, 2020.

11. Starting in approximately 2018, following its merger with Defendant MetroPower, Inc., PPC Partners, Inc. employed Plaintiff, starting at the time of the integration of

its operations with Defendant MetroPower, Inc. and continuing until Plaintiff's termination on May 26, 2020.

12. Defendant MetroPower, Inc. is a for-profit corporation licensed to do business in Georgia and regularly does business in the Middle District of Georgia, where it employed Plaintiff.

13. Defendant MetroPower, Inc. may be served with process through its registered agent, Kayanne Blackwell, 800 21st Avenue, Albany, Georgia 31701.

14. On information and belief, Defendant MetroPower, Inc. is a wholly-owned subsidiary of Defendant PPC Partners, Inc.

15. On information and belief, Defendant PPC Partners, Inc. regularly does business in the Middle District of Georgia, including business done by and through multiple wholly-owned subsidiaries, but is not registered to do business in Georgia.

16. On information and belief, Defendants MetroPower, Inc. and PPC Partners, Inc. were single and/or joint employers of Plaintiff during the relevant time period for purposes of Title VII, the ADA, the FMLA, and the ADEA because, among other things, (a) Plaintiff's work simultaneously benefited both entities; (b) both entities controlled the working conditions and environment for Plaintiff; and (c) all relevant employment policies and practices, including the employment policies and practices regarding Title VII, the ADA, the FMLA, and the ADEA were implemented and controlled by both entities.

17. Defendants are governed by and subject to Title VII.

18. Defendants are governed by and subject to the ADA.

19. Defendants are governed by and subject to the FMLA.

20. Defendants are governed by and subject to the ADEA.

## ADMINISTRATIVE EXHAUSTION

21. Plaintiff has satisfied all administrative prerequisites for bringing her Title VII, ADA, and ADEA claims in this Court.

22. On August 10, 2020, Plaintiff timely filed a Charge of Discrimination with the Equal Employment Opportunity Commission ("EEOC"), in which she asserted her Title VII, ADA, and ADEA claims.

23. On January 5, 2021, the EEOC issued a Notice of Right to Sue regarding Plaintiff's Charge of Discrimination.

24. Plaintiff brings this suit within ninety (90) days of her receipt of the Notice of Right to Sue.

## FACTUAL ALLEGATIONS

25. Plaintiff is a 60-year-old woman.

26. Plaintiff is an individual with disabilities: Anxiety, Depressive Disorder, and Essential Hypertension.

27. According to its website, MetroPower is a "leading electrical and mechanical contracting construction service[] for residential, industrial, institutional, and commercial customers in Georgia, Northern Florida and Southeastern Wisconsin."

28. MetroPower describes its business "[a]s a truly employee-owned company, we operate under the philosophy that satisfied employees create satisfied customers—and drive our company's ongoing growth."

29. On information and belief, MetroPower, Inc. is a wholly-owned subsidiary of PPC.

30. PPC is a group of "four leading electrical and mechanical contracting and construction companies," serving the Midwest and Southeast.

31. Plaintiff began working for MetroPower in approximately November 1995.

32. Plaintiff worked for MetroPower continuously from approximately November 1995 until approximately January 2018, when MetroPower's IT employees became direct employees of PPC, at which time Defendants both employed Plaintiff.

33. When MetroPower hired Plaintiff in 1995, it was just beginning to integrate computers into its operations. At the time, MetroPower had three "dumb terminals" on an IBM System/36, and very few employees had personal computers.

34. Over the next two decades, Plaintiff modernized MetroPower's IT structure and capabilities.

35. During this time period, Plaintiff also furthered her education by becoming a certified Novell Administrator and then an Engineer.

36. Among Plaintiff's many accomplishments in IT, she created the first wide area network for MetroPower, connecting all of the company's branch offices in Georgia, South Carolina, and mobile users.

37. Further, Plaintiff led the company through an adoption of a more user-friendly web-based system that all employees could access.

38. Plaintiff received consistently good performance reviews, including in 2012, 2013, 2014, 2015, 2016, 2017, and 2018.

39. Throughout her employment with Defendants, Plaintiff never received any written discipline and was never placed on a performance improvement plan.

40. Although Plaintiff was continually successful in upgrading many of Defendants' systems, she was regularly denied budget requests that she made in an attempt to gain funding to fully upgrade Defendants' systems.

41. In approximately 2017, Plaintiff's then-Supervisor, Kayanne Blackwell, MetroPower's Controller, told Plaintiff that the next logical step for her would be the Chief Information Officer ("CIO") position.

42. Plaintiff expressed interest in the CIO position to Chief Executive Officer, Danny Gibson, and discussed potentially augmenting her education to better position herself for the CIO position.

43. Mr. Gibson responded, "Why do you want to go back to school now, so close to retirement?"

44. In approximately early 2018, Plaintiff took a bereavement leave due to the loss of her husband to cancer.

45. While Plaintiff was on bereavement leave, Defendants hired Rodriguez Hampton for the CIO position. Mr. Hampton was a younger male outside hire.

46. Plaintiff received no indication that she was considered for the position, despite her many years of service to Defendants' IT Department and her expressed interest in the position. She was not even so much as interviewed for the position.

47. Plaintiff was then informed that she would be directly reporting to Mr. Hampton and that Defendants were restructuring the IT department.

48. As of 2018, when Mr. Hampton started with Defendants as the CIO, Plaintiff's job title was IT Manager.

49. Almost immediately, Mr. Hampton began taking adverse actions against Plaintiff, including freezing her pay and demoting her from the IT Manager to an IT Business Office Manager position. The majority of Plaintiff's responsibilities were stripped from her.

50. Mr. Hampton made several transparent attempts to discredit Plaintiff in a company that she helped to build. Mr. Hampton discussed his opinion of Plaintiff's alleged performance deficiencies with others in a manner that was designed to undermine Plaintiff and to cover up his own inadequacies.

51. Around this same time, Mr. Hampton gave Plaintiff a marginal performance review, but in which he still rated Plaintiff as "satisfactory" overall.

52. Despite Mr. Hampton taking on the CIO role, he needed frequent assistance from Plaintiff on IT issues.

53. Even though Plaintiff regularly assisted Mr. Hampton with IT issues, in approximately 2018 and 2019, Mr. Hampton abusively announced to Defendants' employees that Plaintiff "knew nothing about IT."

54. Additionally, in this same time period, Plaintiff and other female employees were removed, without explanation, from Defendants' Executive Leadership Team.

55. On information and belief, in approximately early 2019, Mr. Hampton told Mr. Gibson that Plaintiff was "not working out," or words to that effect, and would need to be terminated.

56. On information and belief, when Mr. Gibson asked why, Mr. Hampton said it was because Plaintiff "doesn't know anything about IT."

57. In early 2019, Plaintiff was forced to accept a demotion to a Fleet Manager position, solely so that she could remain employed by Defendants.

58. Defendants' purported reason for demoting Plaintiff from IT Business Office Manager to a Fleet Manager was because Defendants established an IT self-service center in which Plaintiff's position was no longer needed.

59. However, Plaintiff's essential job duties and responsibilities as an IT Business Office Manager included numerous tasks which could not be performed autonomously by a self-service center including: (1) deriving the best possible total cost of ownership for all PPC Companies through sourcing, contract management, and strategic operations; (2) leading the evaluation and selection of standard software, hardware, and service suppliers based upon business needs, pricing, scalability, and effectiveness; (3) mitigating risk through vendor and supply chain oversight/availability; (4) overseeing the approval process of technology purchases through tracking and managing of Purchase Requisitions and Purchase Orders; (5) operating as initial contact and escalation point for all vendors and suppliers; (6) holding quarterly business reviews with all strategic vendors; (7) developing and maintaining key performance indicators on cost savings, deliverability, effectiveness, and operational efficiency; (8) developing quarterly forecasting processes to ensure IT spending run-rates are well understood by all IT leadership; and (9) overseeing the annual budget creating process and soliciting input from all IT leadership to ensure all functional areas are properly funded for the coming year.

60. In the Fleet Manager role, Plaintiff reported to her former colleague, Troy DeLee.

61. As a Fleet Manager, Plaintiff was met with continual resistance from the branch management teams, who were dissatisfied with the systemic changes being imposed by Defendants' leadership.

62. Mr. DeLee often verbally abused Plaintiff by repeatedly informing her that "no one likes her." He specifically repeated this comment in a room full of people on or about February 5, 2020.

63. Defendants' discrimination and abuse of Plaintiff took an immense physical and emotional toll on her. Plaintiff began throwing up each day before work and she could not eat or sleep.

64. In approximately February 2020, Plaintiff was diagnosed with Anxiety, Depressive Disorder, and Essential Hypertension.

65. In approximately February 2020, due to her disabilities, Plaintiff applied for FMLA leave and was approved.

66. In approximately March 2020, Defendants terminated the female Human Resources representative who processed Plaintiff's FMLA leave.

67. On April 24, 2020, Plaintiff sent an email to Mr. Gibson with the subject line, "Sad, Disappointed and Hurt." Within that email, Plaintiff (1) complained that she had been subjected to discrimination based on her sex and (2) sought Mr. Gibson's personal opinion on her return following the FMLA leave. Specifically relating to the sex discrimination, Plaintiff complained that "He [Mr. Hampton] has done everything he could possibly do to destroy my reputation. He saw a woman and he made me office manager." Plaintiff further detailed the

impact of Defendants' discrimination and harassment on her health and provided information regarding her ongoing disabilities and symptoms.

68. Mr. Gibson did not respond to Plaintiff's email. In fact, Plaintiff heard nothing from Defendants for over a month.

69. While Plaintiff was on approved FMLA medical leave, and shortly after Plaintiff's April 24, 2020 complaint of sex discrimination and description of ongoing disabilities, Defendants issued a survey to its employees, which included biased questions such as, "Do you recommend Jay remain in the role of Fleet Manager?"

70. The survey produced vague complaints and anonymous responses. From the results of the facially-biased, undermining, and retaliatory survey, Defendants purportedly concluded that Plaintiff was so sub-par that she needed to be terminated.

71. On May 26, 2020, Mr. Gibson called Plaintiff to inform her that there was "no place for [her]" at the company and offered Plaintiff a small amount of severance.

72. The termination caused Plaintiff to lose equity pursuant to the Defendants' Employee Stock Ownership Agreement.

73. Defendants subjected Plaintiff to sex discrimination for years.

74. In violation of Title VII, Defendants retaliated against Plaintiff by terminating her employment after she opposed the pervasive and ongoing sex discrimination to which she had been subjected.

75. Defendants' retaliation of Plaintiff for opposing sex discrimination was willful, wanton, and in reckless disregard for Plaintiff's rights under Title VII.

76. Defendants acted with malice and/or reckless indifference to Plaintiff's federally protected rights.

77. Defendants violated the ADA by discriminating against Plaintiff (1) because of her disabilities and/or because they regarded her as disabled and (2) by failing to accommodate Plaintiff's disabilities.

78. By terminating Plaintiff, Defendants failed to provide Plaintiff a reasonable accommodation for her disabilities, which included allowing her to take and return from a medical leave of absence to receive care related to her disabilities.

79. Defendants acted with malice and/or with reckless indifference to Plaintiff's federally protected rights under the ADA.

80. In addition, or in the alternative, Defendants terminated Plaintiff's employment because she requested FMLA leave for her serious health condition caused by her disabilities.

81. Defendants' termination of Plaintiff interfered with her right to benefits under the FMLA.

82. Defendants' violation of the FMLA with respect to Plaintiff was willful and not in good faith.

83. In addition, or in the alternative, Defendants violated the ADEA by discriminating against Plaintiff on the basis of her age by terminating her employment.

84. Defendants acted with malice and/or with reckless indifference to Plaintiff's federally protected rights under the ADEA.

85. Due to Defendants' violations of federal law, Plaintiff has suffered lost wages and benefits, emotional distress, humiliation, inconvenience, mental anguish, and loss of enjoyment of life.

## COUNT I
### Retaliatory Termination in Violation of Title VII

86. Plaintiff reasserts and incorporates by reference all preceding paragraphs of this Complaint.

87. After subjecting Plaintiff to sex discrimination for years, Defendants retaliated against Plaintiff after she opposed such discrimination by terminating her employment.

88. On April 24, 2020, Plaintiff engaged in protected activity under Title VII when she complained to Mr. Gibson via email that she was being subjected to discrimination based on her sex.

89. Specifically, within that email, Plaintiff stated that, "He [Mr. Hampton] has done everything he could possibly do to destroy my reputation. He saw a woman and he made me an office manager."

90. Defendants retaliated against Plaintiff for engaging in protected activity covered by Title VII by, among other things: (a) issuing a facially-biased, undermining, and retaliatory survey to its employees and (b) terminating Plaintiff's employment.

91. As a consequence of the retaliation she experienced from Defendants, Plaintiff incurred lost wages and benefits, lost equity, and experienced emotional distress, humiliation, inconvenience mental anguish, and loss of enjoyment of life.

92. The actions and inactions of Defendants in retaliating against Plaintiff for engaging in protected activity are willful, wanton, and in reckless disregard for Plaintiff's rights under Title VII.

93. Defendants acted with malice or with reckless indifference to Plaintiff's Title VII rights.

94. Plaintiff seeks all available relief under Title VII, including lost wages and benefits, compensatory damages, punitive damages, interest, reasonable attorneys' fees and costs.

## COUNT II
### Failure to Accommodate in Violation of the ADA

95. Plaintiff reasserts and incorporates by reference all preceding paragraphs of this Complaint.

96. At all relevant times material to the claims herein, Plaintiff was an employee with disabilities within the meaning of the ADA.

97. In approximately February 2020, Plaintiff was diagnosed with Anxiety, Depressive Disorder, and Essential Hypertension.

98. As of at least February 2020, Plaintiff had disabilities within the meaning of the ADA.

99. At all relevant times, Plaintiff was qualified to perform the essential functions of the Fleet Manager position, with or without a reasonable accommodation.

100. At all times material to the claims herein, Defendants were an employer as defined in the ADA, 42 U.S.C § 12111(5).

101. Defendants violated the ADA by failing to provide Plaintiff with a reasonable accommodation for her disabilities, which included allowing Plaintiff to take and return from a medical leave of absence to receive care related to her disabilities.

102. Defendants acted with malice and/or with reckless indifference to Plaintiff's federally protected rights under the ADA.

103. As a consequence of Defendants' violation of the ADA, Plaintiff incurred lost wages and benefits, lost equity, and experienced emotional distress, humiliation, inconvenience mental anguish, and loss of enjoyment of life.

104. Plaintiff seeks all available relief under the ADA, including lost wages and benefits, compensatory damages, punitive damages, interest, reasonable attorneys' fees and costs.

### COUNT III
### Discrimination in Violation of the ADA

105. Plaintiff reasserts and incorporates by reference all preceding paragraphs of this Complaint.

106. At all relevant times material to the claims herein, Plaintiff was an employee with disabilities within the meaning of the ADA.

107. In approximately February 2020, Plaintiff was diagnosed with Anxiety, Depressive Disorder, and Essential Hypertension.

108. As of at least February 2020, Plaintiff had disabilities within the meaning of the ADA and/or Defendants regarded Plaintiff as being disabled within the meaning of the ADA.

109. At all relevant times, Plaintiff was qualified to perform the essential functions of the Fleet Manager position.

110.	At all times material to the claims herein, Defendants were employers of Plaintiff within the meaning of the ADA, 42 U.S.C. § 12111(5).

111.	Defendants violated the ADA by discriminatorily terminating Plaintiff because of her disabilities and/or because Defendants regarded her as disabled.

112.	Defendants acted with malice and/or reckless indifference to Plaintiff's federally protected rights under the ADA.

113.	As a consequence of Defendants' violation of the ADA, Plaintiff incurred lost wages and benefits, lost equity, and experienced emotional distress, humiliation, inconvenience mental anguish, and loss of enjoyment of life.

114.	Plaintiff seeks all available relief under the ADA, including lost wages and benefits, lost equity, compensatory damages, punitive damages, interest, reasonable attorneys' fees and costs.

## COUNT IV
### Interference in Violation of the FMLA

115.	Plaintiff reasserts and incorporates by reference all preceding paragraphs of the Complaint.

116.	At all relevant times, Defendants were and continue to be covered employers within the meaning of the FMLA, 29 U.S.C. § 2611(4)(A).

117.	Plaintiff was an eligible employee within the meaning of the FMLA, 29 U.S.C. § 2611(2)(A).

118.	Plaintiff has a serious health condition under the FMLA.

119.	In approximately February 2020, Plaintiff was diagnosed with Anxiety, Depressive Disorder, and Essential Hypertension.

120. In approximately February 2020, Plaintiff requested and was approved to take FMLA leave for her serious health condition.

121. On or about April 24, 2020, Plaintiff sent an email to Mr. Gibson in which she (1) complained about discrimination and (2) asked for Mr. Gibson's opinion on her return following FMLA leave.

122. Mr. Gibson did not respond to Plaintiff's email. Plaintiff heard nothing from Defendants whatsoever regarding her return to work.

123. Defendants then terminated Plaintiff's employment on May 26, 2020.

124. Defendants' termination of Plaintiff's employment interfered with an FMLA benefit to which she was entitled, including the right to return to work following her FMLA leave.

125. As a consequence of Defendants' interference with Plaintiff's FMLA rights, Plaintiff has incurred lost wages and benefits, and lost equity.

126. Plaintiff seeks all available relief under the FMLA, including lost wages and benefits, lost equity, liquidated damages, interest, reasonable attorneys' fees and costs.

## COUNT V
### Retaliation in Violation of the FMLA

127. Plaintiff reasserts and incorporates by reference all preceding paragraphs of the Complaint.

128. At all relevant times, Defendants were and continue to be covered employers within the meaning of the FMLA, 29 U.S.C. § 2611(4)(A).

129. Plaintiff has a serious health condition under the FMLA.

130. In approximately February 2020, Plaintiff was diagnosed with Anxiety, Depressive Disorder, and Essential Hypertension.

131. Plaintiff engaged in protected activity under the FMLA by requesting and taking FMLA leave.

132. Defendants retaliated against Plaintiff by terminating her employment because she requested and took FMLA leave.

133. As a consequence of Defendants' retaliation against Plaintiff for exercising her FMLA rights, Plaintiff has incurred lost wages and benefits and lost equity.

134. Plaintiff seeks all available relief under the FMLA, including lost wages and benefits, lost equity, liquidated damages, interest, reasonable attorneys' fees and costs.

## COUNT VI
## Age Discrimination in Violation of the ADEA

135. Plaintiff reasserts and incorporates by reference all preceding paragraphs of the Complaint.

136. Plaintiff is 60 years old and, at all relevant times, was an employee protected by the ADEA.

137. At the time of her termination, Plaintiff was more than qualified for the position in which she held, Fleet Manager, having worked for Defendants for approximately 25 years.

138. Defendants harbored a discriminatory animus towards Plaintiff based on her age.

139. Defendants discriminated against Plaintiff in violation of the ADEA by, *inter alia*, terminating her employment because of her age.

140. As a consequence of Defendants' violation of the ADEA, Plaintiff incurred lost wages and benefits, and lost equity.

141. Plaintiff seeks all available relief under the ADEA, including lost wages and benefits, lost equity, liquidated damages, interest, reasonable attorneys' fees and costs.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff demands a TRIAL BY JURY and the following relief:

a) A declaratory judgement that Defendants' practices complained of herein violated Plaintiff's rights under Title VII, the ADA, the FMLA, and the ADEA;

b) Lost wages and benefits resulting from Defendants' Title VII, ADA, FMLA, and ADEA violations, including the value of Plaintiff's lost equity;

c) Compensatory damages for Defendants' Title VII and ADA violations;

d) Punitive damages for Defendants' Title VII and ADA violations;

e) Liquidated damages for Defendants' FMLA and ADEA violations;

f) An award of prejudgment and post-judgement interest;

g) An award of costs and expenses of this action, including reasonable attorneys' fees and costs; and

h) Such other further relief as the Court deems just and proper.

Dated this 22nd day of February 2021.

Respectfully submitted,

*/s/ Justin M. Scott*
Justin M. Scott
Georgia Bar No. 557463
Michael D. Forrest
Georgia Bar No. 974300
SCOTT EMPLOYMENT LAW, P.C.
160 Clairemont Avenue, Suite 610
Decatur, Georgia 30030
Telephone: 678.780.4880

Facsimile: 478.575.2590
jscott@scottemploymentlaw.com
mforrest@scottemploymentlaw.com